UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SIGNATURE SOTHEBY'S
INTERNATIONAL REALTY, INC.,

EXECUTIVE PROPERTY
MAINTENANCE, INC.,

INTRACO CORPORATION, INC.,

CASITE INTRACO, LLC, and

BAHASH & COMPANY, LLC, d/b/a
HILLSDALE JEWELERS,

     Plaintiffs,

v.

GRETCHEN E. WHITMER, and

ROBERT GORDON,

     Defendants.

Civil No.

HON.

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

BUTZEL LONG, P.C.
Daniel J. McCarthy (P59457)
Joseph E. Richotte (P70902)
150 West Jefferson Avenue, Suite 100
Detroit, Michigan 48226
(313) 225-7000
mccarthyd@butzel.com
richotte@butzel.com
*Counsel for Plaintiffs*

Plaintiffs allege as follows:

### INTRODUCTION

1.    Based on speculative modeling on the infectiousness and lethality of a new coronavirus, Governor Whitmer has issued executive orders that have shuttered civil society,

placed 10 million people under house arrest, and taken jobs away from nearly 1.2 million people, all without due process of law.  The Governor has not disclosed the data or methodology used to create the modeling that purportedly justifies this extreme action.  At the same time, through Executive Order 2020-38, she has suspended the Freedom of Information Act through June 4, 2020, preventing any independent assessment of whether the modeling used to justify locking down the entire State is reliable.

2.     The Governor's initial Executive Order was premised on the perceived need to "flatten the curve" so as to avoid overwhelming the State's hospitals and healthcare centers, not to eradicate the virus.  Although the curve has been flattened, the Governor has nonetheless issued stricter and confusing executive orders that unreasonably and unnecessarily interfere with Plaintiffs' constitutional rights.

3.     Governor Whitmer's executive orders are unprecedented.  For the first time in our State's history—indeed, in our nation's history—the State government is mass quarantining *healthy* people instead of the sick.  As a free people, we have the unalienable right to pursue happiness, which includes the freedom to make our own choices about our safety and welfare without unconstitutional interference. In the face of the coronavirus, it means the freedom to choose whether to stay at home, or to keep calm and carry on with the things that make life worth living.

4.     Plaintiffs are affected by the Governor's orders.  Under threat of criminal penalties, they have been forced to close or significantly restrict their businesses, depriving them of their liberty and property interests without due process.  At the same time, without offering any justification, the Governor has allowed, and is still allowing, other businesses deemed "critical" to stay open, even though: (*a*) "critical" businesses must adhere to guidance from the U.S. Centers for Disease Control and Prevention ("**CDC**") on "social distancing"; and (*b*) Plaintiffs are fully capable of adhering to those same guide-lines if allowed to reopen.

5.     Although Michigan, like all States in the Union, is expressly guaranteed a republican form of government under Article IV, Section 4 of the U.S. Constitution, the

Governor has unilaterally suspended civil liberties and announced that this state of affairs will continue even over the Legislature's objection.  When the Legislature announced bills to limit unilateral action and ensure constitutional government remains intact, Governor Whitmer said "***I'm not going to sign any bill that takes power away from me*** or any future governor."

6.      Government by executive order—over 50 of them so far—stirs echoes of royal prerogative.

7.      Ours is a constitutional republic that empowers government to act within defined limits.  Those limits apply at all times and under all circumstances.  In war, in peace, and in pandemics.  "No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government.  Such a doctrine leads directly to anarchy or despotism...." *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 120–122 (1866).

8.      Plaintiffs seek a judicial declaration that the executive orders keeping people in their homes and away from their businesses—and all other orders, rules, and enforcement activity related to them—are unconstitutional under the Dormant Commerce Clause, the Privileges and Immunities Clause, the Privileges or Immunities Clause, the Due Process Clause, the Equal Protection Clause, and State law.  Such a declaration, and a corresponding injunction, will yield a more rational, pragmatic response to the virus that saves lives, saves livelihoods, and preserves constitutional norms all at the same time.

9.      In short, Plaintiffs bring this lawsuit to define the limits of a State's police power.  Whatever its limits, this legal term of art is not some shibboleth that unlocks absolute executive power and casts our Constitution to the wind. The issues raised in this Complaint are novel, and they will not be rendered moot if the executive order is lifted before the Court issues judgment.  The issues presented are capable of repetition and are of such importance that they cannot evade judicial review.

## PARTIES

10.     Plaintiff Signature Sotheby's International Realty, Inc. ("**Sotheby's**"), is a Michigan limited liability company with its principal place of business at 415 South Old Woodward, Birmingham, Michigan 48009.  It engages in foreign, interstate, and intrastate commerce.  Sotheby's is a full-service residential brokerage that represents all price points and practices throughout the State of Michigan.  Sotheby's normally has 282 real estate agents and 18 employees.  Because of the Governor Whitmer's executive orders and Director Gordon's Emergency Order and Emergency Rule, none of its real estate agents are working, and it has had to lay off six employees.

11.     Plaintiff Executive Property Maintenance, Inc. ("**EPM**"), is a Michigan corporation with its principal place of business at 42245 East Ann Arbor Road, Suite 107, Plymouth, Michigan 48170.  It engages in intrastate commerce, but depends on interstate commerce for the goods necessary to perform it intrastate services.  EPM provides to commercial, municipal, and residential clients lawn, snow, and ice maintenance; fertilization; property maintenance; planting; softscape; hardscape; design and build; irrigation; and water-feature services.  EPM is an ISO9001/SN9001 certified company and participates in the Safe Company Program through the National Association of Landscape Professionals.  During its peak season, EPM employs up to 45 employees. Because of the Governor Whitmer's executive orders and Director Gordon's Emergency Order and Emergency Rule, all EPM employees were ordered to stop work.  Even though EO 2020-59 released restrictions on EPM, it still suffers substantial injuries from the restrictions placed on its vendors and customers.

12.     Plaintiff Intraco Corporation, Inc. ("**Intraco**"), is a Michigan corporation with its principal place of business at 530 Stephenson Highway, Troy, Michigan 48083. It engages in foreign, interstate, and intrastate commerce.  Intraco is a major diversified exporter of architectural and automotive glass, automotive chemicals, and other goods. Its business model and success is based on maintaining personal face-to-face relationships

with current and prospective customers in Michigan and elsewhere.  Videoconferencing is not conducive to Intraco's operations.  Intraco's revenue has decreased substantially because of the executive orders and agency orders and rules at issue.  Although some of Intraco's employees in Michigan are performing limited functions at home, Intraco will soon face the harsh reality of laying off its staff if the executive orders and agency orders and rules at issue are not enjoined or rescinded.

13.     Plaintiff Casite Intraco, LLC ("**Casite**"), is a Michigan limited liability company, and a wholly-owned subsidiary of Intraco, with its principal place of business at 530 Stephenson Highway, Troy, Michigan 48083.  Casite engages in foreign, interstate, and intrastate commerce.  It distributes engine oil, fuel additives, and other after-market products for automobiles.  Like Intraco, Casite's business model and success is based on maintaining personal face-to-face relationships with current and prospective customers in Michigan and elsewhere.  Casite contracts through two separate sales representatives, both of which are prohibited from calling on customers directly; videoconferencing is not conducive to Casite's operations.  Casite's revenue has decreased substantially because of the executive orders and agency orders and rules at issue.

14.     Plaintiff Bahash & Company, LLC, doing business as Hillsdale Jewelers, is a Michigan limited liability company with its principal place of business at 77 North Howell Street, Hillsdale, Michigan 49242.  Hillsdale Jewelers engages in interstate and intrastate commerce.  It is a storefront retailer of jewelry and offers jewelry-repair services.  Hillsdale Jewelers has been forced to close because of the executive orders and agency orders and rules at issue.  All three of its employees, including owner-employee Chris Bahash, are unemployed.

15.     Defendant Gretchen E. Whitmer is the Governor of the State of Michigan.  Plaintiffs sue her in her official capacity only.

16.     Defendant Robert Gordon is the Director of the Michigan Department of Health and Human Services.  Plaintiffs sue him in his official capacity only.

## JURISDICTION

17.     This action challenges Governor Whitmer's Executive Orders 2020-43 and 2020-59 (and their predecessors and future iterations of these orders) (the "**EOs**") and Director Gordon's Emergency Order and Emergency Rule (all collectively, the "**Lockdown Orders**"), which Plaintiffs believe violate the following clauses of the U.S. Constitution:

(a)     Dormant Commerce Clause of Article I, Section 8 ;

(b)     Privileges and Immunities Clause of Article IV, Section 1;

(c)     Privileges or Immunities Clause of the Fourteenth Amendment;

(d)     Due Process Clause of the Fourteenth Amendment; and

(e)     Equal Protection Clause of the Fourteenth Amendment.

The Court therefore has federal-question jurisdiction under Article III of the U.S. Constitution and 28 U.S.C. § 1331.

18.     Plaintiffs seek declaratory relief and a preliminary and permanent injunction against the Lockdown Orders and similarly crafted orders and rules issued in the future. Accordingly, they bring this action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the All Writs Act, 28 U.S.C. § 1651.

19.     Plaintiffs also challenge the EOs as exceeding the Governor's authority under the separation-of-powers doctrine enshrined in Article III, Section 2 of the Michigan Constitution of 1963; the Emergency Powers of the Governor Act ("**Emergency Powers Act**"), Mich. Comp. Laws §§ 10.31–10.33; and the Emergency Management Act, Mich. Comp. Laws §§ 30.401–30.421.  Accordingly, Plaintiffs also invoke the Court's supplemental jurisdiction under 28 U.S.C. § 1367.

## VENUE

20.     Governor Whitmer is a resident of, and the principal office of the Governor is located in, Lansing, Michigan.

21.     Director Gordon's principal office is located in Lansing, Michigan.

22.    A substantial part of the events giving rise to the claims in this Complaint occurred in Lansing, Michigan.

23.    The city of Lansing is the seat of government for the State of Michigan. Michigan Const. art. III, § 1 (1963).  It is located within Ingham County, which is within the territorial jurisdiction of the Western District of Michigan.  28 U.S.C. § 102(b)(1). This Court is therefore a proper venue for this action under 28 U.S.C. § 1391(b)(1)–(2).

## EXECUTIVE ACTION

### *Executive Orders*

24.    The Emergency Powers Act permits a governor, "during times of great public crisis, disaster, rioting, catastrophe, or similar public emergency within the State, or reasonable apprehension of immediate danger of a public emergency of that kind, when public safety is imperiled, … [to] proclaim a state of emergency and designate the area involved … [and to] promulgate ***reasonable*** orders, rules, and regulations as he or she considers necessary to protect life or property or to bring the emergency situation within the affected area under control."  Mich. Comp. Laws § 10.31(1) (emphasis added). Executive orders issued under this Act have the force of law.

25.    The Emergency Management Act permits a governor, upon the declaration of an emergency or a disaster, to compel evacuation, to control entry to, exit from, and the occupancy of premises within, the affected area, among other things.  Mich. Comp. Laws § 30.405(1).  Executive orders issued under this Act have the force of law.

26.    On March 11, 2020, Governor Whitmer issued Executive Order 2020-04, which declared a "state of emergency" under both Acts based upon two presumptive diagnoses of coronavirus disease ("**COVID-19**"), a respiratory illness caused by virus named the severe acute respiratory syndrome coronavirus two ("**SARS-CoV-2**" or the "**coronavirus**").

27.    On March 22, 2020, the Governor issued Executive Order 2020-20 under both Acts.  This order closed to the public a wide range of public accommodations, including all restaurants, food courts, cafes, coffeehouses, and other places of public

– 7 –

accommodation offering food or beverages for on-site consumption.  A willful violation of EO 2020-20 is a misdemeanor for which a person can be imprisoned for up to 90 days and fined up to $500.  Mich. Comp. Laws §§ 10.33, 30.405(3), and 750.504; EO 2020-20(6).

28.     On March 23, 2020, the Governor issued Executive Order 2020-21 under both Acts.  This order prohibits all in-person work that the Governor deems "not necessary to sustain or protect life."  A willful violation of EO 2020-21 is a misdemeanor for which a person can be imprisoned for up to 90 days and fined up to $500.  Mich. Comp. Laws §§ 10.33, 30.405(3), and 750.504; EO 2020-20(6).

29.     On April 9, 2020, the Governor issued Executive Order 2020-42 under both Acts.  This order extends EO 2020-21 through April 30, 2020, while imposing even greater restrictions on the general public than before.  A willful violation of EO 2020-42 is a misdemeanor for which a person can be imprisoned for up to 90 days and fined up to $500.  Mich. Comp. Laws §§ 10.33, 30.405(3), and 750.504; EO 2020-42(17).

30.     On April 13, 2020, the Governor issued Executive Order 2020-43 under both Acts.  This order extends EO 2020-20 through April 30, 2020. A willful violation of EO 2020-43 is a misdemeanor for which a person can be imprisoned for up to 90 days and fined up to $500.  Mich. Comp. Laws §§ 10.33, 30.405(3), and 750.504; EO 2020-42(7).

31.     On April 24, 2020, the Governor issued Executive Order 2020-59 under both Acts.  This Order extends EO 2020-42 through May 15, 2020.  It purports to loosen some restrictions imposed under EO 2020-42 as part of a phased reopening of the economy.  A willful violation of EO 2020-59 is a misdemeanor for which a person can be imprisoned for up to 90 days and fined up to $500.  Mich. Comp. Laws §§ 10.33, 30.405(3), and 750.504; EO 2020-59(20).

*Action by MDHHS*

32.     On April 2, 2020, Director Gordon issued an Emergency Order under the Michigan Public Health Code.  Mich. Comp. Laws § 333.2253(1).  This order requires every person in Michigan to comply with EO 2020-20 and EO 2020-21, and authorizes police

– 8 –

and prosecutors to enforce those EOs as incorporated through the Emergency Order.  https://perma.cc/K6ZH-HS6N.  This order also applies to EOs 2020-42, 2020-43, and 2020-59. A violation of an MDHHS order is a misdemeanor punishable by imprisonment for up to six months and a fine of $200, or both.  Mich. Comp. Laws § 333.2261.  Thus, Director Gordon's Emergency Order effectively doubles the period of incarceration authorized under the Governor's executive orders.

33.     At the same time, Director Gordon issued an Emergency Rule establishing a $1,000 civil penalty for violations of Director Gordon's Emergency Order.  https://perma.cc/8W5C-E98N.

34.     So, since April 2, 2020, any person who violates Governor Whitmer's EOs (and thereby automatically violates Director Gordon's Emergency Order and the Emergency Rule) can now be imprisoned for up to six months, assessed a penal fine of up to $500, and assessed a civil fine of up to $1,000.

### GENERAL ALLEGATIONS

35.     Although the coronavirus is highly contagious, it does not invariably result in COVID-19.  For those who do develop COVID-19, the mortality rate is low.  As of April 27, 2020, the State reported on its official coronavirus webpage 38,210 confirmed cases of COVID-19, which is roughly 0.38% of the State population.  Even for the known fractional percent of those who have developed COVID-19, the State reports a 91% survival rate.  As a result, only 0.03% of the State's population has succumbed to the virus.

36.     In all likelihood, the survival rate in Michigan is far higher.  Recent antibody testing conducted in New York State and a study in Los Angeles suggest that millions more have been infected with the coronavirus than previously known, and that the supermajority of those previously infected were either asymptomatic or experienced mild reactions to it.  In New York, this new information has dropped the mortality rate to 0.5%—*i.e.*, a survival rate of 99.5%.  In Los Angeles, it dropped the mortality rate to 0.1–0.3%—*i.e.*, a survival rate of 99.7–99.9%.  There is no reason to believe that Michigan is exempt from this good news.

As more Michiganders are tested, increases in positive tests will yield a higher survival rate.

37. The number of deaths caused by COVID-19, while unquestionably tragic, is not "unprecedented," as routinely claimed. What is unprecedented is Governor Whitmer's response to it.

38. In 1918, in response to the Spanish Flu, Governor Albert Sleeper issued an order closing places of public amusement. Individual cities decided whether to close schools. Work continued. Governor Sleeper wisely balanced public health while preserving commerce. The current executive orders fail to do so, overreaching to such extent that the State's economy is spiraling toward a depression.

39. In the 1940s and the early 1950s, annual summer polio epidemics killed thousands of children before a vaccine was found. Even under such dire circumstances, several Michigan governors of both parties, including Governor G. Mennen Williams, refrained from violating constitutional norms with excessive executive orders during those years.

40. In the late 1960s, the Hong Kong Flu swept across the globe killing more than 1 million people. The CDC estimated that 100,000 people died in the U.S. Michigan, like other States, was affected. Governor George Romney did not place residents under house arrest or shutdown the economy then, either.

41. Governor Whitmer repeatedly states that decisions must be made on data. Yet, despite the positive State-specific data, the Governor *tightened restrictions* through an executive order that the *Wall Street Journal* described as the "most excessive" in the country.

42. Among other enhancements, the new order imposed harsher restrictions on the ability to travel and banned people from visiting their families, working, and purchasing a variety of everyday items at stores. The new order was announced at 3:00 p.m. on April 9th, and became effective at 12:01 a.m. on April 10th—*i.e.*, on less than 12 hours' notice. The Governor timed EO 2020-42 to prohibit families from gathering to celebrate Easter Sunday and Passover.

43.     Although her previous order allowed "critical infrastructure workers" to perform in-person work—defined as those workers described as critical by the director of the U.S. Cybersecurity and Infrastructure Agency ("**CISA**") in guidance issued March 19th—in compliance with CDC guidance on "social distancing," Governor Whitmer has expressly, arbitrarily, and capriciously refused to adopt CISA's updated definition of "critical infrastructure workers," in EO 2020-42 and EO 2020-59.  Other governors who have issued similar executive orders have adopted the updated federal definitions.  Governor Whitmer has never explained why these new definitions have not been, and cannot be, adopted in Michigan.  This is further evidence that the Governor is unreasonably keeping more Michiganders locked up in their homes than necessary.

44.     Taking Governor Whitmer at her word that she wants to make decisions based on data, and lacking confidence in the Governor's modeling because the underlying data and methodology is unavailable to the public, Sotheby's, Intraco, and others hired Anderson Economic Group ("**AEG**") to analyze the infection curve and the economic effects of her EOs, and they provided the expert's report to the Governor on April 13, 2020.  The Governor has not responded.  At a press conference on April 27, 2020, the Governor confirmed that she has not read the expert's report in the two weeks since it was delivered.

45.     An economic depression is predictable following the shutdown of civil society caused by the Lockdown Orders.  Businesses around Michigan are permanently closing because they cannot pay employees and vendors.  More will be forced to permanently close the longer that the Lockdown Orders and any similarly drafted successor orders are in place.

46.     Consistent with the assessments in the AEG report, nearly 1.2 million Michiganders have reportedly filed for unemployment, the largest number of unemployment claims in the State's history.  Michigan is among the top five worst states for unemployment.  Exhibit 1, AEG Report.  According to Jeff Donofrio, Director of the Michigan Department of Labor and Economic Opportunity, this means more than 25% of Michigan's

workforce filed for unemployment in the span of four weeks because of the Lockdown Orders.  For context, the national average unemployment rate during the Great Depression of 1929 was 26%.

47.    Employers fund unemployment benefits.  Mich. Comp. Laws § 421.13.  The Governor has not explained how the unemployment system can keep paying benefits if employers can't operate their businesses.  If businesses can't operate, then they can't generate revenue.  And, if they can't generate revenue, then they have no way of paying into the unemployment fund.

48.    According to the U.S. Department of the Treasury, as of March 31, 2020, Michigan's unemployment trust fund balance was $4.55 billion.  State officials predict that the fund will be drained in July.  https://perma.cc/R54P-GTMU.  One recent prediction is that the Michigan Unemployment Trust Fund will be drained within two months and incur a $15 billion deficit.  Taxes on businesses may double to pay back the loans that the State would require to keep paying unemployment.  This will leave less money for businesses to rehire workers and prolong the economic devastation.

49.    Unemployment is not the only factor in play.  For those fortunate enough to remain employed during this time, many of them are subject to furloughs, pay cuts, and mandatory sick leave.  According to a recent study by the Anderson Economic Group, nearly 1.5 million Michiganders will lose significant income because of the coronavirus and the Governor's orders by the end of April.  Exhibit 1, AEG Report.

50.    Plaintiffs want to reopen their business to help their current and former employees (whom they hope to rehire) put food on their tables, keep roofs over their heads, and clothes on their backs.  Governor Whitmer and Director Gordon forbid them from doing so under pain of criminal punishment and civil fines.  Plaintiffs should not be forced to choose between risking criminal prosecution and economic sanctions on the one hand, or exercising their constitutional rights on the other.

51.     Plaintiffs incorporate all of the foregoing paragraphs into each of the following causes of action.

## COUNT I
## DORMANT COMMERCE CLAUSE

52.     "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983.

53.     The Commerce Clause of the U.S. Constitution grants Congress the power "[t]o regulate commerce with foreign Nations, among the several States, and with the Indian Tribes."  U.S. Const. art. I, § 8, cl. 3.

54.     In its dormant state, often called the Dormant Commerce Clause, the Commerce Clause precludes States from enacting legislation that discriminates against or impermissibly burdens interstate commerce.  State laws that facially discriminate against interstate commerce are invalid *per se* under the Commerce Clause.  This is true also of State laws that are facially neutral, if they impermissibly burden interstate commerce in practice.  *West Lynn Creamery* v. *Healy*, 512 U.S. 186, 194–195 (1994).

55.     Although the Dormant Commerce Clause is usually invoked to challenge protectionist laws that favor in-state businesses over out-of-state businesses, the Clause has a broader function:  to guarantee for all citizens the right to access and participate in interstate commerce.  Just as no State can prevent out-of-staters from engaging in commerce with its residents, no State may prevent its residents from participating in commerce with those located in another State.

56.     The Lockdown Orders impermissibly restrict Plaintiffs from exercising the right to engage in interstate commerce:

(a)    *Sotheby's*.  Approximately 15–20% of Sotheby's annual business involves customers who buy and sell homes in Michigan while located outside of Michigan.  The Lockdown Orders have prevented, and still prevent, Sotheby's from securing new out-of-state customers because the Lockdown Orders categorically prohibit Sotheby's from showing homes and performing the other customary services provided by realtors and real estate brokers.  Sotheby's is even prohibited from conducting video showings of homes and showing vacant homes to prospective buyers.

(b)    *Intraco*.  The Lockdown Orders preclude Intraco from using its offices to conduct the face-to-face meetings that are necessary to establish new relationships and maintain existing relationships with vendors and customers located inside and outside of Michigan.  Intraco has suffered a 20% drop in revenue and has lost business opportunities because of the Lockdown Orders.

(c)    *Casite*.  The Lockdown Orders preclude Casite from using its offices to conduct the face-to-face meetings that are necessary to establish new relationships and maintain existing relationships with vendors and customers located inside and outside of Michigan.   Casite has suffered a 30% drop in revenue and has lost business opportunities because of the Lockdown Orders.

(d)    *Hillsdale Jewelers*.  The Lockdown Orders has prevented Hillsdale Jewelers from importing precious metals and stones to create custom jewelry, from engaging in retail jewelry purchases and sales, and from performing jewelry-repair services.  Hillsdale Jewelers has suffered a 99% drop in revenue because of the Lockdown Orders.

57.    Governor Whitmer and Director Gordon acted under color of State law in an official capacity and within the scope of their official duties when issuing the Lockdown Orders.

58.    Plaintiffs seek a declaration that the Lockdown Orders violate the Dormant Commerce Clause, and an injunction against further infringements of their rights under this Clause as described in the Prayer for Relief.

## COUNT  II
## PRIVILEGES AND IMMUNITIES CLAUSE

59.     "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983.

60.     The Privileges and Immunities Clause of Article IV of the U.S. Constitution provides that "[t]he citizens of each State shall be entitled to all privileges and immunities of citizens in the several States."  U.S. Const. art. IV, § 2, cl. 1.

61.     The Privileges and Immunities Clause protects a citizen's right to pursue a livelihood in a State other than the State in which he is a resident.  *Baldwin* v. *Fish & Game Comm'n of Montana*, 436 U.S. 371 (1978).

62.     The Lockdown Orders impermissibly restrict Plaintiffs from exercising these rights:

(a)     *Sotheby's*.  The Lockdown Orders have prevented, and continue to prevent, Sotheby's from seeking work and clients located outside of Michigan.  They also categorically prohibit Sotheby's from showing homes and performing the other customary services provided by realtors and real estate brokers, even though real estate companies like Sotheby's located in other States have been, and remain, free to do so, and even though real estate is specifically identified by CISA as a critical business.

(b)     *Intraco*.  The Lockdown Orders have prevented, and continue to prevent, Intraco from nurturing existing and establishing new client relationships with vendors and customers out of state.  Travel for in-person meetings, essential to Intraco's business model but deemed "noncritical" by the Governor, has been and remains prohibited under the Lockdown Orders.

(c)     *Casite*.  The Lockdown Orders have prevented, and continue to prevent, Casite from nurturing existing and establishing new client relationships with vendors and

customers out of state.  Travel for in-person meetings, essential to Casite's business model but deemed "noncritical" by the Governor, have been and remain prohibited under the Lockdown Orders.

(d)  *Hillsdale Jewelers*.  The Lockdown Orders have prevented, and continue to prevent, Hillsdale Jewelers from engaging in commerce with customers who travel to its storefront from locations outside the state.

63.  Governor Whitmer and Director Gordon acted under color of State law in an official capacity and within the scope of their official duties when issuing the Lockdown Orders.

64.  Plaintiffs seek a declaration that the Lockdown Orders violate the Privileges and Immunities Clause, and an injunction against further infringements of their rights under this Clause as described in the Prayer for Relief.

## COUNT  III
## PRIVILEGES OR IMMUNITIES CLAUSE

65.  "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983.

66.  The Privileges or Immunities Clause of the Fourteenth Amendment to the U.S. Constitution provides that "[n]o State [can] make or enforce any law [that] abridge[s] the privileges or immunities of citizens of the United States."  U.S. Const. am. XIV, § 1, cl. 2.

67.  The right to travel between States is a privilege of federal citizenship.

68.  The right to engage in interstate commerce is also a privilege of federal citizenship.

69.  The Lockdown Orders impermissibly restrict Plaintiffs from exercising these rights:

(a)    *Sotheby's.*  The Lockdown Orders have prevented, and continue to prevent, Sotheby's from seeking work and clients located outside of Michigan.  They also categorically prohibit Sotheby's from showing homes and performing the other customary services provided by realtors and real estate brokers, even though real estate companies like Sotheby's located in other States have been, and remain, free to do so, and even though real estate is specifically identified by CISA as a critical business.

(b)    *Intraco.*  The Lockdown Orders have prevented, and continue to prevent, Intraco from nurturing, existing, and establishing new client relationships with vendors and customers out of state.  Travel for in-person meetings, essential to Intraco's business model but deemed "noncritical" by the Governor, has been and remains prohibited under the Lockdown Orders.

(c)    *Casite*.  The Lockdown Orders have prevented, and continue to prevent, Casite from nurturing, existing, and establishing new client relationships with vendors and customers out of state.  Travel for in-person meetings, essential to Casite's business model but deemed "noncritical" by the Governor, have been and remain prohibited under the Lockdown Orders.

(d)    *Hillsdale Jewelers*.  The Lockdown Orders have prevented, and continue to prevent, Hillsdale Jewelers from engaging in commerce with customers who travel to its storefront from locations outside the state.

70.    Governor Whitmer and Director Gordon acted under color of State law in an official capacity and within the scope of their official duties when issuing the Lockdown Orders.

71.    Plaintiffs seek a declaration that the Lockdown Orders violate the Privileges or Immunities Clause, and an injunction against further infringements of their rights under this Clause as described in the Prayer for Relief.

## COUNT  IV
## PROCEDURAL DUE PROCESS

72.     "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983.

73.     The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that no State can "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1, cl. 3.

74.     The procedural component of the Due Process Clause prohibits government from depriving Plaintiffs of liberty and property interests without providing any process before or after the deprivations occurred.

75.     To establish a procedural due process claim under 42 U.S.C. § 1983, a plaintiff must show that (1) it had a life, liberty, or property interest protected by the Due Process Clause; (2) it was deprived of this protected interest; and (3) the state did not afford it adequate procedural rights.  See *Daily Servs., LLC* v. *Valentino*, 756 F.3d 893, 904 (CA6 2014).

76.     Plaintiffs have a protected liberty interest in the right to live without arbitrary governmental interference with their liberty and property interests.  *County of Sacramento* v. *Lewis*, 523 U.S. 833, 845 (1988).

77.     Liberty "denotes not merely freedom from bodily restraint ***but also the right of the individual to contract, to engage in any of the common occupations of life***, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, ***and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men***."  *Board of Regents of State Colleges* v. *Roth*, 408 U.S. 564, 572 (1972) (emphases added).

78.     Plaintiffs had protected liberty and property interests, which Defendants infringed through the Lockdown Orders:

(a)     *Sotheby's*.  Sotheby's has been, and is being, denied the right to intrastate travel and the right to engage in commerce, to-wit: facilitating the sale of homes.

(b)     *EPM*.  EPM has been denied the right to intrastate travel and the right to engage in commerce, to-wit: selling its services to maintain the value of real property.

(c)     *Intraco*.  Intraco has been, and is being, denied the right to interstate travel, the right to intrastate travel, and the right to engage in commerce, to-wit: growing and maintaining its distributorship business.

(d)     *Casite*.  Casite has been, and is being, denied the right to interstate travel, the right to intrastate travel, and the right to engage in commerce, to-wit: growing and maintaining its distributorship business.

(e)     *Hillsdale Jewelers*.  Hillsdale Jewelers has been, and is being, denied the right to engage in commerce, to-wit: buying, selling, and repairing jewelry.

79.     Neither Governor Whitmer nor Director Gordon provided any procedural due process before issuing the Lockdown Orders.  Nor do the Lockdown Orders provide any mechanism for post-deprivation review.

80.     Governor Whitmer and Director Gordon acted under color of State law in an official capacity and within the scope of their official duties when issuing the Lockdown Orders.

81.     As a direct and proximate cause of the failure to provide any pre- or post-deprivation process, Plaintiffs suffered prejudice under threat of criminal and civil sanctions.

82.     These orders and rules acknowledge that so-called "critical" businesses and those "noncritical" can safely operate by adhering to "social distancing" rules delineated in Section 11 of EO 2020-59, including the arbitrary "enhanced social distancing" rules that apply only to the "noncritical" businesses allowed to resume operations.

83.     Plaintiffs can operate in full compliance with all of these rules.

84.     By failing to provide any pre- or post-deprivation review of the orders and rules shuttering their businesses, Plaintiffs are suffering substantial losses of liberty and property:

(a)     *Sotheby's*.  Sotheby's has lost roughly $1 million in revenue over the four weeks since the Lockdown Orders went into effect.  April 2020 business has dropped 67% compared to one year ago.  Pending sales for May 2020 are down 92% compared to one year ago.  Approximately 20% of pending deals have been lost.  Sotheby's will continue to experience financial losses in the second quarter of 2020 and beyond because of the Lockdown Orders.

(b)     *EPM*.  EPM has experienced lost and delayed contracts.  Securing grounds-keeping contracts for condominium and other customers has been substantially delayed because condo association boards are unable to meet to sign contracts.  Customers have been and still are withholding landscape deposits out of fear that EPM will permanently shutter its operations.  Customers on installment plans have been and still are withholding installment payments; they do not want to pay invoices if EPM can't provide the services they're paying for.  Other existing and potential customers have been and still are unwilling to enter into new service contracts for 2020, citing the Governor's executive orders.  The lost revenue from the multi-week delay in starting spring projects has created financial hardship in paying bills, making payroll, and meeting other fiscal demands.  EPM will continue to experience financial losses because of the Lockdown Orders.

(c)     *Intraco*.  Intraco has lost over 20% of expected revenues for the first quarter of 2020 as compared to last year.  It has also lost business opportunities and expectancies because of the restrictions imposed under the Lockdown Orders.  Intraco also owns the building at the site of its principal place of business.  Intraco will continue to experience financial losses in the second quarter of 2020 and beyond because of the Lockdown Orders.

(d)   *Casite*.  Casite has lost over 30% of expected revenues for the first quarter of 2020 as compared to last year.  It has also lost business opportunities and expectancies because of the restrictions imposed under the Lockdown Orders.  Casite will continue to experience financial losses in the second quarter of 2020 and beyond because of the Lockdown Orders.

(e)   *Hillsdale Jewelers*.  Hillsdale Jewelers was experiencing year-over-year growth in the first quarter of 2020 before the Lockdown Orders first went into effect.  Because of the Lockdown Orders, it ended the first quarter of 2020 with no growth and has lost 99% of expected revenues since closing.  Even if the Lockdown Orders are enjoined or rescinded in the coming weeks, Hillsdale Jewelers will experience a nearly 50% drop in revenue (or more) for the second quarter of 2020.  It has therefore suffered, and will continue to suffer, financial losses in the second quarter of 2020 and beyond because of the Lockdown Orders.

85.   The prejudice each Plaintiff has suffered would not have occurred but for Defendants' deprivations of their liberty and property interests.

86.   Plaintiffs seek a declaration that the Lockdown Orders violate the procedural component of the Due Process Clause, and an injunction against further infringements of their rights under this Clause as described in the Prayer for Relief.

## COUNT  V
## SUBSTANTIVE DUE PROCESSS

87.   "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983.

– 21 –

88.     The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that no State can "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1, cl. 3.

89.     The substantive component of the Due Process Clause prohibits government from taking action that "shocks the conscience" or "interferes with rights implicit in the concept of ordered liberty."  United States v. Salerno, 481 U.S. 739, 746 (1987) (cleaned up).

90.     Plaintiffs have a protected liberty interest in the right to live without arbitrary governmental interference with their liberty and property interests.  County of Sacramento v. Lewis, 523 U.S. 833, 845 (1988).

91.     Liberty "denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men."  *Board of Regents of State Colleges* v. *Roth*, 408 U.S. 564, 572 (1972) (emphases added).

92.     The Lockdown Orders shock the conscience and interfere with Plaintiffs' deeply-rooted liberty and property rights, including the to work, right to contract, and right to engage in commerce, for all of the reasons described in the General Allegations and in each of the Counts of this Complaint, which are incorporated into this Paragraph by reference.

93.     Each Plaintiff could and can conduct business in full compliance with all of the rules imposed on businesses allowed to operate under the Lockdown Orders, or reasonably equivalent and equally safe measures tailored to the unique nature of the in-person operations.  Thus, the Lockdown Orders are not narrowly tailored to achieve a compelling governmental interest.

94.     Nor is there any rational basis to deprive Plaintiffs of their liberty and property interests in performing services for willing customers when they can do so safely and in the same (or reasonably safe equivalent) manner as other businesses allowed to operate.

95.     In the alternative, the Lockdown Orders are not reasonably related to a legitimate governmental interest.

96.     Governor Whitmer and Director Gordon acted under color of State law in an official capacity and within the scope of their official duties when issuing the Lockdown Orders.

97.     Plaintiffs seek a declaration that the Lockdown Orders violate the substantive component of the Due Process Clause, and an injunction against further infringements of their rights under this Clause as described in the Prayer for Relief.

## COUNT  V
## EQUAL PROTECTION

98.     "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983.

99.     The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides that no State can "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1, cl. 4.

100.     The Lockdown Orders deprive Plaintiffs of the equal protection of the law because they allow some businesses to operate but not Plaintiffs' businesses, even though they are similarly situated.

101.    Each Plaintiff could and can conduct business in full compliance with all of the rules imposed on businesses allowed to operate under the Lockdown Orders, or reasonably equivalent and equally safe measures tailored to the unique nature of the in-person operations.  Thus, the Lockdown Orders are not narrowly tailored to achieve a compelling governmental interest.

102.    Nor is there any rational basis to deprive Plaintiffs of their liberty and property interests in performing services for willing customers when they can do so safely and in the same (or reasonably safe equivalent) manner as other businesses allowed to operate.

103.    In the alternative, the Lockdown Orders are not reasonably related to a legitimate governmental interest.

104.    Governor Whitmer and Director Gordon acted under color of State law in an official capacity and within the scope of their official duties when issuing the Lockdown Orders.

105.    Plaintiffs seek a declaration that the Lockdown Orders violate the Equal Protection Clause, and an injunction against further infringements of their rights under this Clause as described in the Prayer for Relief.

### COUNT  VI
### DECLARATORY JUDGMENT
### VOID FOR VAGUENESS

106.    There is an actual and present controversy between the parties.

107.    Plaintiffs contend that the Lockdown Orders are unconstitutionally vague under the void-for-vagueness doctrine under the U.S. and Michigan constitutions.

108.    The void-for-vagueness doctrine requires penal laws to define criminal conduct with sufficient precision that ordinary people can understand what conduct is prohibited, and in a manner that does not encourage arbitrary and discriminatory enforcement.  *Kolender* v. *Lawson*, 461 U.S. 352, 357–358 (1983).  This doctrine flows

from the Due Process Clause.  *Michigan Dep't of State Compliance & Rules Div.* v. *Michigan Educ. Ass'n*, 251 Mich. App. 110, 116 (2002); U.S Const., am. XIV; Mich. Const. (1963), art. I, § 17.

109.    The Lockdown Orders purport to carry the force of law and (with the exception of Director Gordon's Emergency Rule) makes any willful violation of their terms a misdemeanor punishable by imprisonment or a fine.  It is therefore subject to the void-for-vagueness doctrine.

110.    EO 2020-42 allows certain businesses to continue operations if they fall within certain "sectors" of the economy, but it does not identify any criteria by which a business owner can safely determine whether his or her business falls within that sector. Incongruities are evident within the order.

111.    The very fact that the Governor needs a webpage to answer "frequently asked questions" about the scope of the order shows that it's vague.  Michiganders are smart people.  If "ordinary people" could understand the Lockdown Order, then there would be no need for ***125+ FAQs*** on these orders on the State's coronavirus webpage.

112.    On information and belief, Governor Whitmer and Director Gordon deny these contentions.

113.    Plaintiffs seek a judicial declaration that the Lockdown Orders are void for vagueness, and an injunction against enforcement or adoption of these and similar orders and rules in the future as described in the Prayer for Relief.

## COUNT  VII
## DECLARATORY JUDGMENT
## SEPARATION OF POWERS

114.    There is an actual and present controversy between the parties.

115.    Plaintiffs contend that EO 2020-43 and EO 2020-59 (and their predecessors) violate the Separation of Powers Clause in Article III, Section 2 of the Michigan Constitution of 1963, and that the EOs prohibit them—directly through the executive

order itself and indirectly through Director Gordon's Emergency Order and Emergency Rule—from engaging activities in which they would otherwise be free to engage under threat of criminal sanction.

116.    The Separation of Powers Clause provides that "[t]he powers of government are divided into three branches: legislative, executive, and judicial.  No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."  Mich. Const. (1963) art. III, § 2.

117.    The Emergency Powers Act violates the Separation of Powers Clause because it vests governors with total legislative power whenever a governor asserts the existence of an emergency.

118.    The Emergency Management Act does not violate the Separation of Powers Clause on its face, but it does as Governor Whitmer has applied it.  As the Governor appears to construe it, the Emergency Management Act gives her limitless powers equal in scope to the Emergency Powers Act.  The language of the Act does not confer such unlimited powers on the Governor.

119.    On information and belief, Governor Whitmer and Director Gordon deny these contentions.

120.    Plaintiffs seek a judicial declaration that the Lockdown Orders violate the Separation of Powers Clause, and an injunction against enforcement or adoption of these and similar orders and rules in the future as described in the Prayer for Relief.

## COUNT  VIII
## DECLARATORY JUDGMENT
## UNLAWFUL EXERCISE OF EMERGENCY POWERS ACT

121.    There is an actual and present controversy between the parties.

122.    Plaintiffs contend that EO 2020-43 and EO 2020-59 (and their predecessors) violate the Emergency Powers Act, if they pass constitutional muster.

123.    Viruses, like SARS-CoV-2, and the diseases they can cause, like COVID-19, are not the kind of emergencies contemplated under the Emergency Powers Act, which applies "[d]uring times of great public crisis, disaster, rioting, catastrophe, or similar public emergency within the state, or reasonable apprehension of immediate danger of a public emergency of that kind, *when public safety is imperiled*...."  Mich. Comp. Laws § 10.31.

124.    Public health and public safety are distinct legal concepts.  Governor Whitmer has not identified a public *safety* emergency in any of the EOs.  Instead, she has only selectively quoted from the portion of the Act that allows her to issue orders necessary to protect life or property or to bring the emergency under control.  EO 2020-42, Preamble ¶ 4.  Absent a public *safety* emergency, the Governor has no power to issue orders under the Emergency Powers Act at all.  Neither SARS-CoV-2 nor COVID-19 have presented a public safety emergency.

125.    Alternatively, even if SARS-CoV-2 or COVID-19 qualify as a public safety emergency, the Emergency Powers Act does not authorize the *de facto* statewide house arrest imposed under the EOs.  The Act says a governor may "designat[e] *specific zones* within the area in which occupancy and use of buildings and ingress and egress of persons and vehicles may be prohibited or regulated."  Mich. Comp. Laws § 10.31(1).  Governor Whitmer, however, has regulated occupancy and use of buildings statewide.  The EOs violate the Act because it is not limited to specific zones within Michigan.

126.    Alternatively, the Emergency Powers Act only authorizes a governor to issue *reasonable* orders that are considered necessary to protect life or property or to bring the emergency under control.  Mich. Comp. Laws § 10.31(1).

127.    The EOs are objectively unreasonable.  There can be nothing more unreasonable than keeping 10 million people under house arrest because 0.38% of the population has contracted a disease that has killed less than 0.03% of the population.

128.    Likewise, it is unreasonable to cause nearly 1.2 million men and women to lose their jobs virtually overnight, or to cripple businesses, or to cause businesses to permanently close on those same facts, especially when many of these people reside in counties with less than 25 cases and far fewer (or even no) deaths.

129.    Michigan has 83 counties.  As of April 27, 2020, five counties in Michigan still had no confirmed cases, and 37 counties had fewer than 25 cases.  As of that same date, 25 counties had no deaths, and 59 counties had less than 10 deaths.

130.    Similarly, it is unreasonable to maintain these EOs when the policies contained within them have plunged the State into Depression-level unemployment.

131.    On information and belief, Governor Whitmer and Director Gordon deny these contentions.

132.    Plaintiffs seek a judicial declaration that the EOs violate the Emergency Powers Act, an injunction against enforcement of the Lockdown Orders, and an injunction against similar orders and rules in the future as described in the Prayer for Relief.

## COUNT  IX
## DECLARATORY JUDGMENT
## UNLAWFUL EXERCISE OF EMERGENCY MANAGEMENT ACT

133.    There is an actual and present controversy between the parties.

134.    Plaintiffs contend that EO 2020-43 and EO 2020-59 (and their predecessors) violate the Emergency Management Act, if they pass constitutional muster.

135.    The Emergency Management Act permits a governor to declare a disaster in response to the occurrence of threat of widespread loss of life resulting from natural causes, including an epidemic.  See Mich. Comp. Laws § 30.402(e) (including epidemics in the list of causes of disasters).  Thus, infectious diseases by themselves are not a permissible reason to invoke the Act—the disease must reach or threaten to reach epidemic status.

136.    Although the World Health Organization has classified SARS-CoV-2 as a pandemic, that is not controlling under Michigan law.  The existence of an epidemic must be determined solely from the perspective of the facts as they exist on the ground *in Michigan*.

137.    With confirmed infections affecting only 0.38% of the State as of the date of this Complaint, no epidemic actually exists throughout all of Michigan.  While a regional epidemic *likely* exists in a few densely populated areas, one does not exist in all 83 counties in Michigan, as demonstrated by persistently low numbers of infections and deaths in the majority of Michigan's counties.

138.    In addition, the Emergency Management Act does not contemplate declaring the entire State a disaster area.  Among other things, the Act allows a governor to issue orders affecting a "stricken" or "threatened" area, including mandatory evacuation orders, controlling ingress and egress from that area, and the occupancy of premises within that area.  Mich. Comp. Laws § 30.405(1)(e)–(g).

139.    Moreover, even when grounds exist to declare a disaster, the executive order must indicate, among other things, the nature of the conditions permitting the termination of the state of disaster.  Mich. Comp. Laws § 30.403(3).  None of Governor Whitmer's executive orders have articulated objective conditions that, when satisfied, would permit the termination of the state of disaster.

140.    On information and belief, Governor Whitmer and Director Gordon deny these contentions.

141.    Plaintiffs seek a judicial declaration that the EOs violate the Emergency Management Act, an injunction against enforcement the Lockdown Orders, and an injunction against similar orders and rules in the future as described in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask the Court to grant them the following relief:

1.      A declaratory judgment that the Lockdown Orders:

(a)     violate Plaintiffs' constitutional rights as set forth in this Complaint;

(b)     are void for vagueness; and/or

(c)     violate the Separation of Powers Clause of the Michigan Constitution, the Emergency Powers Act, and/or the Emergency Management Act;

2.      Enjoin Governor Whitmer and Director Gordon from enforcing the Lockdown Orders and from issuing any future orders or rules similar to the invalid ones described in this action;

3.      Award Plaintiffs their reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988 and any other applicable law; and

4.      Any other such further relief to which Plaintiffs may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

## JURY DEMAND

Under the Seventh Amendment to the U.S Constitution and Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury on all issues so triable.

Respectfully submitted,

BUTZEL LONG, P.C.

Dated:  April 28, 2020

*/s/ Daniel J. McCarthy*

DANIEL J. McCARTHY (P59457)
JOSEPH E. RICHOTTE (P70902)
150 West Jefferson Avenue, Suite 100
Detroit, Michigan 48226
(313) 225-7000
mccarthyd@butzel.com
richotte@butzel.com
*Counsel for Plaintiffs*

BH2889693.22